PETROPLUS, JUDGE:
This is an action to recover the sum of $55,817.82, an alleged underpayment arising from a contract, dated April 1, 1970, for a road construction project in Mason County, West Virginia, designated No. ER0485 (002), wherein Melbourne Brothers Construction Co., an Ohio corporation, hereinafter referred to as the Claimant or the Contractor, agreed with West Virginia Department of Highways, hereinafter referred to as the Respondent or the State, to construct according to plans and specifications furnished by the State, certain roads designated U. S. 35 and W. Va. Route 2, including fills for embankments and ramps, and grading and paving certain segments thereof. The contract was awarded on a bid proposal setting forth estimated quantities with unit prices for each bid item, and the aggregate estimated cost of the project was in the amount of $1,819,-679.41. The two bid items in controversy are:
Item 2
Unclassified excavation, estimated quantity of 33,570 cubic yards at $1.71 per cubic yard — $57,404.00
Item 3-1
Borrow excavation, estimated quantity of 305,125 cubic yards at $1.71 per cubic yard — $521,763.00
By way of explanation, unclassified excavation is earth movement in the project area, while borrow excavation is material brought into the area from excavations elsewhere. In both instances the material is used to complete the roadway and embankments. In this case both items happened to be the same price per cubic yard.
*281 In the defined work area extending approximately 1000 feet, U.S. Route 35 and W. Va. Route 2 intersected. An overpass and four ramps, identified on the Plans as Permanent Ramps A, B, C, and D, as well as two ramps designated “Temporary Ramp A” and “Temporary Ramp B”, provided approaches to the Silver Bridge crossing the Ohio River and the Shadle Bridge crossing the Kanawha River to Point Pleasant. The ramps designated Temporary “A” and “B” and the Permanent Ramps A and B were functioning prior to the contract as part of the traffic patterns for the existing Silver Bridge and Route 2.Only Permanent Ramps C and D were new construction and they required substantial fill material for proper elevation. Segments of Route 35 and Route 2 requiring fills and embankments were also new construction. All ramps provided connections with the two main highways and accommodated traffic in all directions.
The construction entailed grading, draining, paving, placing embankments, and the maintenance of traffic during the period of construction, all in accordance with the State Road Commission Standard Specifications for Roads and Bridges, adopted 1960, as amended by Special Provisions adopted in 1965. Among the contract documents are General Notes furnished to the Contractor, which set forth a so-called “Sequence of Operation”. The latter, by reason of its importance in deciding this case, is hereinafter set forth verbatim:

“SEQUENCE OF OPERATIONS

1. The contractor shall erect and maintain all necessary traffic control devices required to safeguard the public within the areas of work at all times.
2. Construct the embankment for U. S. 35, Ramp “C” omitting embankment between Stations 997+30 and 981+35, and Ramp “D” and extend the concrete box culvert on W. Va. 2 at Station 38+55.
3. Construct temporary fence on school property.
4. Construct the proposed drainage east of existing W. Va. 2.
5. Construct the proposed W. Va. 2 embankment for the northbound lanes while maintaining traffic on the southbound lanes of W. Va. 2.
6. Complete all the remaining work on U. S. 35 and W. Va. 2 including the pavement, guard rails and roadway items.
*282 7. Complete all work on Ramp “C” once school property has been vacated.
8. Remove the pavement and excavate the embankment from Temporary Ramp “A” and Temporary Ramp “B”. The contractor shall so schedule his work that the excavated material shall be incorporated in the roadway embankment of this contract. Cost of placing the material shall be included in the unit price bid for unclassified excavation. Place 3” penetration macadam shoulder on outside of Ramp “A” from Station 31+43 to Station 43 + 15 and on outside of Ramp “B” from Station 59+00 to Station 60+50 and from Station 63+80 to Station 65+30 as directed by the engineer.
9. The contractor shall be responsible for maintaining traffic as outlined above until completion and acceptance of the roadway pavement.
The contractor’s attention is directed to Section 1.4.6 of the Standard Specifications requiring the maintenance of local traffic.”
The 8th specification required the material resulting from removal of Temporary Ramp “A” and Temporary Ramp “B” to be utilized on the project as fill to form embankments for the new road segments.
By strictly adhering to the “Sequence of Operations” the Contractor found himself in a dilemma. After completing the new road with borrow material, it was impossible under Item 8 to incorporate the excavated material derived from the removal of Temporary Ramp “A” and Temporary Ramp “B” into the already completed roadway embankments required by the contract, and he was compelled to waste said material off the project site. For the fills and embankments of the new roadway, previously constructed with borrow material, the Contractor received payment at the unit bid price of $1.71 per cubic yard. The borrow excavation estimated in the bid proposal at 305,125 cubic yards actually overran into an additional 33,035 cubic yards. For this the Contractor was fully paid. The fill material from the removal of the Temporary Ramps could not be used and had to be wasted, as surplus material.
The Contractor now seeks payment for 32,642 cubic yards of the wasted material at $1.71 per cubic yard under the item of Unclassi *283 fied Excavation in the bid proposal, or a total of $55,817.82. All of the above facts were undisputed.
At the hearing, evidence was adduced by both parties on the issue of whether the plans and specifications which required the Contractor to use the excavated material and incorporate it in the work were in error, making it impossible for the Contractor to perform, thereby requiring the Contractor to waste the material, or whether the Contractor could have performed his work without wasting this material and still comply with the maintenance of traffic provisions of the contract.
The Claimant’s contention is that he was required to adhere strictly to the Sequence of Operations, completing each phase as outlined and then going on to the next phase. The Respondent contends that the plans and specifications are not in error, and that there is a certain flexibility in the sequence which permits the Contractor to work on different items at the same time, dovetailing his work, and still maintaining a traffic flow. By so doing the Contractor could have followed the specifications and used the material as fill in the project without waste.
The testimony was in sharp conflict on whether the construction sequence required the Contractor to complete the grading and paving of Route 35 and ramp approaches before the removal of the Temporary Ramps in order to maintain a reasonable and safe traffic pattern.
The president of the contracting company, who was a civil engineer, testified that it was impossible to establish a safe and feasible traffic plan by an earlier removal of the Temporary Ramps. In this he was corroborated by the job superintendent. The State’s engineers, admittedly self-interested, testified to the contrary and specifically described how a traffic flow could have been established by using crossovers, four-way stops, flagmen, warning signs, and channeling devices without undue hazard to the traveling public. This issue must be resolved in favor of the State.
It is the factual finding of this Court that an operational plan for traffic could have been devised by the Contractor after the removal of the Temporary Ramps and before the building of the embankments of the new road and approaches, which would have been safe and feasible. The excavated material would then have been available and *284 incorporated into the project as contemplated by the contract specifications, and the Contractor would have been paid for the same under the item of Unclassified Excavation. In that event less material would have been required under the item of Borrow Excavation for the fills, thereby reducing the overrun on that item substantially. It is coincidental that the wasted material is substantially equivalent to the additional material borrowed for the fills, and prices for unclassified excavation and borrow excavation are the same.
A road contractor is required to build the road in accordance with plans and specifications under the supervision of the State’s engineer and produce a result. The modus operandi is under his control and if the State impedes the progress of the work this Court has often held that the expenses arising from unwarranted delays are compensable. The materials used and the quality of the work are subject to inspection by the State, and it would be an officious act for the State to interfere with the coordination devised by the Contractor in order to efficiently accomplish his result.
Every road contractor with the State is confronted by a maze of regulations that are incorporated into the contract by reference. In addition, he is faced with special provisions, supplemental specifications, general conditions, construction sequence,, and other contract documents such as plans, profiles, cross-sections and change orders, all of which must be followed under the supervision of the State’s engineers who are charged with the duty of requiring the contractor to fulfill his contract according to its terms and conditions. Quite often other contractors are at work in the project area and must not be impeded. The contractor’s position is not enviable, and he is faced with many problems, many of which were not in the contemplation of the contract when the work commenced.
All regulations which are a part of the contract are complimentary and provide for a complete result — the fulfillment of the contract. This requires a high degree of coordination and no specification can be blindly adhered to in disregard of other specifications that may be conflicting. The contractor is presumably free to exercise his sound judgment as to the prosecution of the work from as many different points and in such part or parts and at such times as he deems expedient to insure the completion of the contract in a timely manner and provide for the safety and convenience of the traveling public. The State Engineer decides all questions which- may arise as to the inter *285 pretation of the plans and specifications to assure the satisfactory and acceptable fulfillment of the terms of the contract.
This brings us to the so-called “Construction Sequence”, which is a contract document, and its relation to the other specifications. The scheduling of the different phases of the work is primarily the responsibility of the contractor, and the construction sequence is for his guidance and intended to help him coordinate his work rather than hinder or impede him. It cannot be followed ordinarily in such a rigid manner as to preclude the fulfillment of the other requirements of the contract. It is a general outline of procedure, with some degree of flexibility for adaptation to the other specifications, and intended for ultimate fulfillment of the contract according to all the plans and specifications. It should not be used in such a manner as to give rise to unnecessary claims for extra compensation not contemplated by the contract.
The problem with which this Claimant was faced did not arise from conditions developing which are not anticipated by the parties. It existed from the very beginning of the Contract. If it was a problem it could have been resolved at the preconstruction conference, the forum intended for that purpose. In this case the Claimant completed his fills, embankments, and paving for the new construction and then wrote to the Respondent that it had a problem — what shall we do with the surplus material excavated from the Temporary Ramps, which we promised to use as fills for the new road but cannot do so because the fills were all made with borrowed material. This in effect was the problem.
It is our finding that notwithstanding the difference of opinion among the witnesses who testified, the fact that traffic could have been maintained in some manner after the removal of the Temporary Ramps was satisfactorily established. It may not have been an ideal plan, but there was a plan. The record does not disclose any effort on the part of the Contractor to seek the guidance of the State’s engineer on devising such a plan. It appears that the Contractor waited almost a year after the work commenced to present this problem to the Department of Highways, and then after completion of the new paving it was too late to do anything other than seek an outlet for the surplus material that could not go into the project.
The argument of the Contractor that a departure from the Sequence of Operations would have been a violation and breach of his *286 contract to build according to plan, although persuasive, is not controlling when the sequence outlined by the State obviously shows that it is impossible to perform a successive step if a prior step is completely finished.
The Contractor must abide by his contract and perform his undertaking no matter at what cost, unless performance is absolutely impossible. In this case the Contractor made it impossible to perform by completing his new paving before making the excavation of the old. We must distinguish that which is foreseeable from the outset of the contract from that which could not have been foreseen by the Contractor. When a contract is clear, unqualified and absolute, it must be performed, unless performance is absolutely impossible.
Attention is called to a provision in the General Notes for the project which reads as follows:
“Any modification of the construction sequence or method of maintaining traffic, which the Contractor might wish to make shall be submitted in writing to the engineer at least fifteen days prior to beginning work for approval from the commission.”
The above implies a degree of flexibility in following a construction sequence where a problem may arise between the contracting parties. A sequence of construction does not require rigid adherence when the consequences result in the inability to perform the contract. Rigid compliance with a sequence may be required under some circumstances, especially where a critical path must be followed to prevent interference with other phases of the project, but under the circumstances in this case we find no critical factor that afforded a compelling reason to complete one phase to the exclusion of another. The testimony in fact revealed that work proceeded on a number of phases in the construction sequence concurrently.
For the reasons stated in this Opinion the Contractor is not entitled to compensation for the wasted and surplus material, and no award will be made in this case.
Claim disallowed.